UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

JOHNICE SANDERS,                      )
                                      )
                    PLAINTIFF,        )
                                      )
        VS.                           )        CAUSE NO. 2:11-CV-216-RLM-APR
                                      )
MICHAEL J. ASTRUE,                    )
COMMISSIONER OF SOCIAL SECURITY,      )
                                      )
                    DEFENDANT.        )

OPINION and ORDER

Plaintiff Johnice Sanders seeks judicial review of the Commissioner of Social Security's final decision denying her application for Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act, 42 U.S.C. § 1381, *et seq.* The court has jurisdiction over this action under 42 U.S.C. §§ 405(g) and 1383(c). For the reasons that follow, the court reverses and remands this case to the Social Security Administration for further proceedings consistent with this opinion.

I. BACKGROUND

Ms. Sanders filed her initial application for SSI benefits on January 15, 2008, asserting an onset date of that same date due to a number of issues including back problems, torn ligaments in her right ankle, stress, forgetfulness, depression, sleep problems, vision difficulties, and arthritis in her lower back and forth finger on her left hand. (AR 12, 201). Her application

was denied initially, on reconsideration, and following an administrative hearing in January 2010, at which she was represented by counsel. At that hearing, the administrative law judge ("ALJ") heard testimony from Ms. Sanders and vocational expert ("VE") Thomas Grzesik. The ALJ found that Ms. Sanders had some severe physical and mental impairments but still could perform certain jobs available in the national and regional economy, and she was therefore not disabled within the meaning of the Act. *See* 20 C.F.R. § 416.920(g). The Appeals Council denied review of the ALJ decision, making the ALJ's decision the final determination of the Commissioner. The parties agree that the matter is properly before this court.

## II. STANDARD OF REVIEW

The court must affirm the Commissioner's determination if it is supported by substantial evidence, 42 U.S.C. § 405(g); <u>Scott v. Astrue</u>, 647 F.3d 734, 739 (7th Cir. 2011), which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); *see also* <u>Jones v. Astrue</u>, 623 F.3d 1155, 1160 (7th Cir. 2010). The court can't re-weigh the evidence, make independent findings of fact, decide questions of credibility, or substitute its own judgment for that of the Commissioner, <u>Simila v. Astrue</u>, 573 F.3d 503, 513 (7th Cir. 2009), but in reviewing the ALJ's conclusions, "[t]he court will conduct a critical review of the evidence, considering both the evidence that supports, as well as the evidence that detracts from, the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." <u>Briscoe v. Barnhart</u>, 425 F.3d 345, 351 (7th Cir. 2005). The ALJ isn't required "to address every piece of evidence or testimony presented, but must provide a 'logical bridge' between the evidence and the conclusions so that [the court] can assess the validity of the agency's ultimate findings and afford the claimant meaningful judicial review." <u>Jones v. Astrue</u>, 623 F.3d 1155, 1160 (7th Cir. 2010).

### III. Discussion

The Social Security Administration uses a sequential five-step analysis to determine if a claimant is disabled. *See* 20 C.F.R. § 416.920. The first step considers whether the claimant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, the evaluation continues. The fourth step assesses a claimant's residual functional capacity ("RFC") and ability to engage in past relevant work. If a claimant can engage in past relevant work, she is not disabled. The fifth step assesses the claimant's RFC, as well as her age, education, and work experience to determine whether the claimant can engage in other work. If the claimant can engage in other work, she is not disabled. *See* Craft v. Astrue, 539 F.3d 668, 673-674 (7th Cir. 2008).

Using the standard five-step evaluation for determining disability, the ALJ found that while Ms. Sanders suffered from dysthymic disorder,[1] obesity, and lumbar disc disease, none of these impairments met the criteria of any listed impairment described in Appendix 1 of the SSI Regulations (20 C.F.R.,

---

[1] Dysthymic disorder is a chronic type of depression in which a person's moods are regularly low. American Psychiatric Association, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS § 300.4 (4th ed., Text Rev. 2000) ("DSM-IV").

Subpart P, Appx. 1). He further found that while Ms. Sanders couldn't perform her past work as a housekeeper, she was able to perform a significant number of jobs available in the national economy.

This appeal concerns Ms. Sanders's mental impairments and limitations, not her physical impairments and limitations. The ALJ found that although Ms. Sanders suffered from dysthymic disorder, the mental impairment didn't meet Listing 12.04 (Affective Disorders). The ALJ rejected the opinion of Ms. Sanders's treating psychiatrist, Dr. Eugene Kang, about the severity of Ms. Sanders's depression and the limitations the impairment imposed on her ability to work. Instead, the ALJ gave great weight to the opinions of two state agency psychologists.

Ms. Sanders contends that the ALJ committed a number of errors. First, in finding that Ms. Sanders didn't meet the requirements of Listing 12.04, Ms. Sanders contends that the ALJ improperly afforded great weight to the opinion of the two state agency psychologists, but not to Ms. Sanders's treating psychiatrist. Second, Ms. Sanders contends that the ALJ improperly described her RFC and the corresponding hypothetical posed to the VE. In a related vein, Ms. Sanders maintains that the ALJ failed to question the VE about discrepancies between his testimony and agency regulations. And, finally, Ms. Sanders alleges that the ALJ improperly evaluated her credibility regarding the intensity, persistence, and limiting effects of the symptoms from which she suffered.

## A. The ALJ's Weighing of Medical Opinions

Ms. Sanders submitted medical records, including a questionnaire prepared by Dr. Kang in April 2009 that stated that Ms. Sanders suffered from a severe mental impairment which met the requirements of Listing 12.04. In his opinion denying Ms. Sanders's disability, the ALJ rejected Dr. Kang's opinion but gave significant weight to the opinions rendered by two evaluating psychologists, Drs. J. Gange and F. Kladder. (AR 13, 17). Ms. Sanders argues that it was improper for the ALJ to afford greater weight to the opinions of the non-examining physicians over the opinion of her treating physician.

Under section 12.04, an affective disorder (like Ms. Sanders's dysthymia) can qualify as a listed impairment under Appendix 1 of the Regulations when a claimant satisfies both the "paragraph A" and "paragraph B" criteria, or when a claimant satisfies both the "paragraph A" and "paragraph C" criteria. The ALJ concluded that Ms. Sanders satisfied the "paragraph A" criteria "because she has been diagnosed with and received treatment for dysthymic disorder." (AR 13). "Paragraph B" requires the claimant to show that the mental impairment result in at least two of the following:

> 1. Marked restriction of activities of daily living; or
> 2. Marked difficulties in maintaining social functioning; or
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
> 4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Part 404, Subpart P, Appx. 1, section 12.04

Dr. Kang indicated in an April 2009 questionnaire that it was his opinion that Ms. Sanders had marked difficulties in maintaining concentration, persistence, or pace; moderate limitations in social functioning; and mild limitations in activities of daily living. (AR 400). Dr. Kang had no opinion on whether Ms. Sanders had experienced any episodes of decompensation. (AR 400).

The ALJ ultimately chose to give no weight to Dr. Kang's findings with regard to the "paragraph B" criteria because Ms. Sanders's "limited mental health treatment records do not support a finding that [Ms. Sanders] has marked limitations in any area of functioning," citing mental health records in which Ms. Sanders is noted as "displaying normal, goal directed speech, with a concrete thought process, and absence of delusions, hallucinations, or suicidal ideation" and citing treatment notes suggesting that Ms. Sanders's depressive symptoms had improved with treatment. (AR 13-14). Instead, the ALJ found that Ms. Sanders had "moderate difficulties" with concentration, persistence, or pace because of her mental impairment. (AR 14). The ALJ further concluded that Ms. Sanders didn't meet any of the "paragraph C" criteria. (AR 14). Considering Ms. Sanders's RFC, the ALJ also chose to give no weight to Dr. Kang's finding that Ms. Sanders was precluded from working because of her mental impairments. (AR 18).

The ALJ gave a couple reasons for rejecting Dr. Kang's opinions. First, the ALJ observed that Dr. Kang had only seen Ms. Sanders three times at the time of his April 2009 assessment, which the ALJ concluded was insufficient

time to allow for a longitudinally accurate assessment of Ms. Sanders's mental functioning. (AR 18). Second, the ALJ stated that Ms. Sanders's treatment records submitted after Dr. Kang's April 2009 assessment were inconsistent with a finding that she was unable to work because the records demonstrate that Ms. Sanders's mental impairments improved over the course of 2009 while she was on the drug Celexa. (AR 18-19).

A treating physician's opinion is given "controlling weight" if it is both "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. § 416.927(c)(2). An ALJ can reject the treating physician's opinion only if the ALJ performs a detailed analysis of the treating physician's opinion and provides an explanation and "good reasons" for the weight ultimately afforded to that opinion. Campbell v. Astrue, 627 F.3d 299, 308 (7th Cir. 2010) (*citing* 20 C.F.R. § 416.927(d)(2) (now 416.927(c)(2))); *see also* Eakin v. Astrue, 432 F. App'x 607, 612 (7th Cir. 2011). The applicable regulations "guide that decision by identifying several factors that an ALJ must consider: 'the length, nature, and extent of the treatment relationship; frequency of examination; the physician's specialty; the types of tests performed; and the consistency and support for the physician's opinion.'" Campbell v. Astrue, 627 F.3d at 308 (*quoting* Larson v. Astrue, 615 F.3d 744, 751 (7th Cir. 2010)). The court of appeals has made clear when an ALJ elects not to give the treating physician's opinion controlling weight it must "explicitly address the checklist of factors as applied to the medical opinion evidence." Id.

At this juncture, the ALJ ran afoul of regulations: he failed to consider properly all the factors identified in the SSI regulations when deciding how much weight to afford Dr. Kang's opinion.

Ms. Sanders posits that the ALJ shouldn't have rejected Dr. Kang's opinion in light of his limited interactions with Ms. Sanders because Social Security Administration regulations don't require a doctor to treat a claimant for a specific number of times before the doctor is qualified to assess a claimant's impairments. (Doc. No. 17 at 9). The length and nature of the treatment relationship, though, was a proper consideration.

Ms. Sanders is correct that the regulations do not specify an exact number of examinations that must be completed. But the regulations state that an ALJ is to give a treating source's opinion more weight than the opinion of a non-treating source "[w]hen the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment." 20 C.F.R. § 416.927(c)(2)(i). When determining the amount of weight to afford a treating physician's opinion, the ALJ must consider, among other factors, "the length, nature, and extent of the treatment relationship," as well as the "frequency of examination." Campbell v. Astrue, 627 F.3d at 308. The ALJ properly considered evidence that Dr. Kang was unable to provide a sufficient longitudinal picture of Ms. Sanders's dysthymia. When Dr. Kang filled out the questionnaire, he had only seen Ms. Sanders on three occasions, and Dr. Kang noted that he couldn't fill out a portion of the questionnaire that asked about the number of days Ms. Sanders was likely to miss each month

because he had only seen Ms. Sanders three times. (AR 401). Although the ALJ erred by failing to evaluate all of the required factors, his consideration of the length of Ms. Sanders's treatment relationship with Dr. Kang was not improper.

While the ALJ adequately and properly considered the "the length, nature, and extent of the treatment relationship" and "frequency of examination," the ALJ neglected to discuss the other factors in the regulations. Ms. Sanders argues that the ALJ erred by not discussing Dr. Kang's opinion more fully to support his decision to give the opinion no weight. Specifically, the ALJ failed to consider Dr. Kang's medical specialty, as well as the supportability and consistency of Dr. Kang's opinion under 20 C.F.R. § 416.927(c).

As to supportability, the ALJ noted that clinical notes post-dating Dr. Kang's April 2009 questionnaire suggest that Ms. Sanders's condition was improving. (AR 18-19). The ALJ didn't articulate how this improvement rendered Dr. Kang's prior opinion inconsistent or unsupported. The ALJ didn't articulate exactly how Dr. Kang's opinion was inconsistent with other evidence in the record. *See* 20 C.F.R. § 404.927(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.").

At the same time Ms. Sanders was reporting some improvement, Dr. Kang noted Ms. Sanders's depressed mood (AR 426, 438, 444), poor cognitive function (AR 438), low energy and motivation (AR 438), poor sleep (AR 438),

conflicts with family and friends (AR 444, 446, 450), crying spells (AR 450, 452), and hallucinations (AR 450, 452) in his own treatment notes. Lynette Thomas, a therapist at Dr. Kang's facility, also noted these symptoms in her treatment notes. (AR 432, 436, 442, 448). Dr. Kang's GAF score of 55 (AR 425, 430, 434-35, 438, 444, 446, 450, 452, 460, 464) is consistent with the conclusion of Dr. Irena Walters, the consultative examining psychologist, who assessed a GAF score of 50 to 55. (AR 358). In short, the ALJ didn't articulate how evidence of some improvement by Ms. Sanders while she was on the drug Celexa renders Dr. Kang's opinion inconsistent or unsupported.

The ALJ didn't discuss the supportability of Dr. Kang's opinion beyond noting that Ms. Sanders's condition seemed to be improving. The ALJ didn't discuss the testing and evidence underlying Dr. Kang's opinion. The ALJ could have chosen to afford little to no weight to Dr. Kang's opinion because the opinion was contained in an evaluation form questionnaire that he completed by checking appropriate boxes to standard questions without any extended discussion. But the ALJ did not articulate such a basis for rejecting Dr. Kang's assessment. Finally, the ALJ didn't discuss Dr. Kang's medical specialty when weighing his opinion as the regulations require. 20 C.F.R. § 416.927(c). Because the ALJ didn't adequately consider all of the required factors when he decided what weight to afford Dr. Kang's opinion, Ms. Sanders's case must be

remanded to the Social Security Administration for further proceedings on this issue.[2]

### B. The ALJ's Hypotheticals Concerning Ms. Sanders's Concentration, Persistence or Pace

Ms. Sanders next contends that the ALJ's RFC didn't incorporate all of her functional limitations, rendering flawed the ALJ's hypothetical question to the VE. The RFC is the most a claimant can do despite her mental and physical limitations. *See* SSR 96-8p. The RFC finding is to be based on the medical evidence in the record and other evidence, such as testimony by the claimant or her friends and family. Id.

At Step 3, the ALJ found that Ms. Sanders has moderate difficulties in concentration, persistence, or pace. (AR 14). At Step 4, the RFC analysis, the ALJ found once again that Ms. Sanders has "deficits in . . . concentration, persistence, or pace," and in light of these deficits the ALJ said he was limiting Ms. Sanders "to performing simple, routine, and repetitive tasks." (AR 20). The ALJ concluded that Ms. Sanders's RFC was: "light work as defined in 20 CFR 416.967(b) except she can only occasionally climb, balance, stoop crouch, kneel or crawl" and that Ms. Sanders is further limited "to performing simple, routine, and repetitive tasks, with no interactions with co-workers or the general public." (AR 15).

---

[2] Ms. Sanders also argues that the ALJ didn't sufficiently discount the opinions of Drs. Gange and Kladder because they rendered opinions before Ms. Sanders sought treatment for her depression. (Doc. No. 17 at 12). The ALJ noted that he considered the fact that Drs. Gange and Kladder rendered opinions before Ms. Sanders's treatment. (AR 17).

Ms. Sanders contends that because the ALJ didn't incorporate into his RFC finding his conclusion that Ms. Sanders possesses moderate limitations in concentration, persistence, or pace, the ALJ's decision runs afoul of O'Connor-Spinner v. Astrue, 627 F.3d 614 (7th Cir. 2010). Ms. Sanders argues that the ALJ erred in failing to include these limitations in his RFC finding and the hypotheticals posed to the VE. Ms. Sanders's argument is well-taken.

In O'Connor-Spinner v. Astrue, the court of appeals held that "[i]n most cases . . . employing terms like 'simple, repetitive tasks' on their own will not necessarily exclude from the VE's consideration those positions that present significant problems of concentration, persistence and pace." 627 F.3d at 620. There are exceptions to the rule, and a faulty hypothetical isn't always grounds for remand. The O'Connor-Spinner court described a first exception in which a VE sometimes is assumed to be familiar with a claimant's alleged disabilities even when there are holes in the hypothetical. Id. The assumption only applies when "the record shows that the VE independently reviewed the medical record or heard testimony directly addressing those limitations." Id. This record indicates that the VE both reviewed the file and heard testimony relating to Ms. Sanders's mental limitations. (AR 87).

That doesn't end the inquiry. The court of appeals further explained in O'Connor-Spinner that such an exception doesn't apply when "the ALJ poses a series of increasingly restrictive hypotheticals to the VE." 627 F.3d at 619. The ALJ did just that when he posed two increasingly restrictive hypotheticals. (AR 83). First, the ALJ posed the following hypothetical to the VE:

> Why don't you assume an individual of the claimant's age,
> education, work experience who is able to perform light exertion
> with limitations to all postural activities. Further assume that such
> individual is limited to simple routine and repetitive tasks. Can
> such an individual perform the past work you just identified?

(AR 83). After the VE answered in the affirmative, the ALJ narrowed the scope

of the hypothetical.

> Next I'd like you to assume that same individual and the same
> limitations and in addition such an individual could not have any
> interaction with the public and no interaction with co-workers.
> Can such an individual perform claimant's past work?

(AR 83). The VE answered the second question in the negative. (AR 83).

The court therefore must look to the next possible exception. The

O'Connor-Spinner court explained that a hypothetical still can be appropriate

even when it doesn't include the phrase "concentration, persistence and pace"

if "it was manifest that the ALJ's alternative phrasing specifically excluded

those tasks that someone with the claimant's limitations would be unable to

perform." 627 F.3d at 619. For example, courts have let stand hypotheticals

that restrict plaintiffs with panic disorder limitations to low-stress work. Id. An

exception was made allowing a hypothetical in which the ALJ did not refer to

the limitations of concentration, persistence or pace, but referred to the

underlying conditions of a chronic pain disorder and a somatoform disorder.

Simila v. Astrue, 573 F.3d 503, 521-522 (7th Cir. 2009). Even applying that

reasoning here, the ALJ didn't refer to Ms. Sanders's underlying limitations or

conditions in any way in his hypotheticals. (AR 83).

The ALJ's hypothetical must ensure that "the VE eliminate[d] positions that would pose significant barriers to someone with the applicant's depression-related problems in concentration, persistence, and pace." O'Connor-Spinner v. Astrue, 627 F.3d at 620. Because the ALJ's hypothetical did not do so, the court must remand for further proceedings.

The Commissioner tries to distinguish O'Connor-Spinner on the grounds that the ALJ in that case included his finding that the claimant suffered from moderate limitations in concentration, persistence and pace in the RFC finding, rather than the explanatory text as done here. (Doc. No. 24 at 8-9). The Commissioner doesn't explain the import of the precise location in the opinion at which the ALJ makes the determination and why that distinction changes the analysis. The court of appeals demands that "[w]hen an ALJ poses a hypothetical question to a vocational expert, the question must include all limitations supported by medical evidence in the record." Stewart v. Astrue, 561 F.3d 679, 684 (7th Cir. 2009). The ALJ erred by not including Ms. Sanders's limitations in his RFC finding and by not including the limitations in the hypothetical posed to the VE.

The Commissioner further argues that the hypothetical accounted for Ms. Sanders's limitation with respect to concentration, persistence, or pace by limiting the jobs to those that constitute "simple, routine, and repetitive tasks." (Doc. No. 25 at 9-10). That argument runs afoul of the Social Security Administration's statement that, "[b]ecause response to the demands of work is highly individualized, the skill level of a position is not necessarily related to

-15-

the difficulty an individual will have in meeting the demands of the job. A claimant's [mental] condition may make performance of an unskilled job as difficult as an objectively more demanding job." SSR 85-15. The Administration thus has acknowledged that unskilled work does not adequately account for a claimant's mental impairments.

The Commissioner cites to Johansen v. Barnhart, 314 F.3d 283, 289 (7th Cir. 2002), in which an ALJ adopted a medical opinion where a doctor had "translated" the checkmarks on a mental RFC assessment form into a suggested RFC that the claimant could engage in repetitive, low-stress work. Our case has no comparable "translation" from a physician. In Johansen, the RFC reflected some work requirements that were relevant to mental abilities (i.e., repetition and stress); in our case, the RFC was for "simple, routine, and repetitive" work, which doesn't by itself provide any information about Ms. Sanders's mental condition or abilities. See Craft v. Astrue, 539 F.3d 668, 677 (7th Cir. 2008).

In O'Connor-Spinner, the court of appeals noted that "limiting a hypothetical question to simple, repetitive work does not necessarily address deficiencies of concentration, persistence, or pace." 627 F.3d at 620. That ALJ had found that the claimant had moderate limitations in concentration, persistence, or pace, but omitted these limitations in hypothetical questions posed to the VE. Id. at 618. Instead, in his hypothetical questions, the ALJ only limited the claimant to "routine, repetitive tasks with simple instructions." Id. The court of appeals found this hypothetical unclear as to whether it "would

cause the vocational expert to eliminate positions that would pose significant barriers to someone with the applicant's depression-related problems in concentration, persistence, and pace." Id. at 620.

Similarly, the limitation to simple, routine, repetitive tasks doesn't fully encompass Ms. Sanders's mental limitations. The court must remand to the Social Security Administration for reconsideration of this issue so that it may appropriately account for Ms. Sanders's limitations with respect to concentration, persistence, or pace.


## C. The ALJ's RFC Finding Regarding Interaction with Co-Workers and the General Public

Ms. Sanders contends that the ALJ also erred in his RFC finding by finding Ms. Sanders capable of performing unskilled work with no interaction with co-workers and the general public. Ms. Sanders asserts that such a finding is contradictory because unskilled work, by definition, requires interaction with co-workers. (Doc. No. 17 at 14). In support of this contention Ms. Sanders cites SSR 85-15 which states that "[t]he basic mental demands of competitive remunerative, unskilled work includes the abilities (on a sustained basis) . . . to respond appropriately to supervision, coworkers, and usual work situations." Ms. Sanders argues that because the ALJ found that she could not interact with co-workers, under SSR 85-15, this limitation precludes all competitive employment. (Doc. No. 17 at 15). This argument goes too far; a VE still could find that Ms. Sanders can perform select jobs that meet all the

limiting criteria. *See* <u>Donahue v. Barnhart</u>, 279 F.3d 441, 446 (7th Cir. 2002) (holding that an ALJ is entitled to accept a VE's conclusion, even when that conclusion seemingly contradicts *Dictionary of Occupational Titles* descriptions).

Next, Ms. Sanders argues that the VE erred by interpreting the ALJ's limitation of "no interaction with co-workers" to mean at least some casual interaction with co-workers because the definitions of the jobs he cited from the *Dictionary of Occupational Titles* ("DOT") as available to Ms. Sanders require some interaction with co-workers. (Doc. No. 17 at 15). Ms. Sanders argues that the ALJ was required to question the VE about discrepancies between his testimony and the DOT, and the ALJ erred by not doing so. This argument is well-taken: the ALJ had an obligation to question the VE about apparent discrepancies between his testimony and the DOT.

The VE testified that his testimony was consistent with the DOT (AR 84), but the available jobs cited by the VE are inconsistent with the DOT descriptions of those jobs: "Assembler, Production," DOT No. 706.687-010 ("May be assigned to different work stations as production needs require . . . may be designated according to part or product produced."); "Assembler, Small Products I," DOT No. 406.684-022 ("Frequently works at bench as member of assembly group assembling one or two specific parts and passing unit to another work."); "Electronics Worker," DOT No. 726.687-010 ("Performs any combination of following tasks to clean, trim, or prepare components or parts for assembly by other workers: Receives verbal or written instructions from supervisor regarding work assignment."). The ALJ erred in accepting VE

testimony that was inconsistent with the DOT descriptions without further questioning the VE about the discrepancies. *See* SSR 00-4p; <u>Overman v. Astrue</u>, 546 F.3d 456, 463 (7th Cir. 2008) (holding that "SSR 00-4p imposes an affirmative duty *on the ALJ* to inquire into and resolve apparent conflicts" between DOT and VE testimony) (emphasis in original).

The ALJ failed to inquire further about the apparent conflict between the DOT and the VE's testimony during his questioning of the VE. A conflict is apparent if it is "so obvious that the ALJ should have picked up on [it] without any assistance." <u>Id.</u> The DOT descriptions of "Assembler, Production," "Assembler, Small Products I," and "Electronics Worker" obviously conflict with the ALJ's finding that Ms. Sanders was limited to jobs with "no interactions with co-workers or the general public" (AR 15) because the DOT jobs listed by the VE clearly contemplate some interaction with co-workers.

The Commissioner responds that Ms. Sanders's failure to object to the VE's testimony at the hearing allows the ALJ to reasonably rely upon the VE's testimony. (Doc. No. 24 at 11). An ALJ is entitled to accept the VE's opinion about the availability of eligible jobs that Ms. Sanders could perform. *See* <u>Donahue v. Barnhart</u>, 279 F.3d at 446 ("When no one questions the vocational expert's foundation or reasoning, an ALJ is entitled to accept the vocational expert's conclusion, even if that conclusion differs from the [DOT] . . . ."). But the ALJ had a duty to question the VE about the conflicts to build the logical bridge between the evidence and his conclusion. *See* <u>Overman v. Astrue</u>, 546 F.3d at 463; <u>Weatherbee v. Astrue</u>, 649 F.3d 565 (7th Cir. 2011) ("Ruling 00-4p

does not require ALJs to wholly disregard a VE's testimony because part of it disagrees with the DOT, but Ruling 00-4p does require ALJs to resolve discrepancies between the two before relying on conflicting testimony."). The ALJ can credit the VE's testimony in conflict with the DOT, but the ALJ must resolve the discrepancy by further questioning the VE about it. Because the ALJ didn't do so, the court must remand to the Social Security Administration.

## D. MS. SANDERS'S CREDIBILITY

An ALJ's assessment of a claimant's credibility is entitled to deference and is not grounds for reversal and remand unless it is "patently wrong." Craft v. Astrue, 539 F.3d at 678. In assessing the credibility of Ms. Sanders, the ALJ had to articulate the reasons for his decision in such a way as to "make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for the weight." Brindisi v. Barnhart, 315 F.3d 783, 787-88 (7th Cir. 2003) (*citing* SSR 96-7p).

Ms. Sanders contends that the ALJ failed to properly analyze her credibility under SSR 96-7p. The ALJ found that Ms. Sanders's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that her "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (AR 16). The court of appeals has repeatedly criticized this credibility language from ALJs as "unhelpful," Shauger v. Astrue, 675 F.3d 690, 696-697 (7th Cir. 2012),

"opaque," Bjornson v. Astrue, 671 F.3d 640, 644-645 (7th Cir. 2012), and "meaningless." Parker v. Astrue, 597 F.3d 920, 921-922 (7th Cir. 2010). It has explained that the template backwardly "implies that the ability to work is determined first and is then used to determine the claimant's credibility." Bjornson v. Astrue, 671 F.3d at 645-646.

While this sort of boilerplate is inadequate by itself to support a credibility finding, its use doesn't make a credibility determination invalid; not supporting a credibility determination with explanation and evidence from the record does. See Punzio v. Astrue, 630 F.3d 704, 709 (7th Cir. 2011); Parker v. Astrue, 597 F.3d at 921-22. In Brindisi v. Barnhart, 315 F.3d at 787-788, the court held that SSR 96-7p prohibits a "conclusory determination" of a claimant's credibility, requiring instead than an ALJ explain the weight given to a claimant's statements with citations to evidence in the record in support of that determination. In that case the ALJ's credibility determination was deficient because he did "not explain the weight given to the [claimant's] statements and [did] not support his determination with any evidence in the record." Id. at 788. The court of appeals found the ALJ had "turn[ed] the credibility determination process on its head." Id.

Brindisi and the district court cases cited by Ms. Sanders establish the principle that an ALJ can't simply state the outcome of the credibility assessment, but must explain the various factors and evidence that support the ultimate conclusion. The ALJ made a record of just such an explanation in concluding that Ms. Sanders's claimed degree of limitation wasn't credible. (AR

16-20). The ALJ didn't merely conclude that Ms. Sanders's symptoms weren't credible to the extent they were inconsistent with the RFC assessment. Rather, the ALJ carefully explained how Ms. Sanders's claimed limitations aren't supported by the record evidence.

With regard to her mental impairments, the ALJ cited the record and noted that Ms. Sanders "did not begin to receive any sort of mental health treatment until 2009," suggesting her depression was not as limited as she claimed. (AR 20). The ALJ noted that Ms. Sanders's treating physician observed that Ms. Sanders "displayed normal, goal directed speech, with a concrete thought process, and absence of delusions, hallucinations, or suicidal ideation." (AR 18). The ALJ further noted that Ms. Sanders's physician wrote in a follow-up examination report that "most of [Ms. Sanders's] complaints stemmed from her physical condition, rather than her psychological ones." (AR 18). The ALJ also cited evidence in the record that Ms. Sanders reported that her depressive symptoms improved somewhat with medication and counseling. (AR 19). Finally, the ALJ noted that Ms. Sanders had never been hospitalized for her mental impairments.

Ms. Sanders also argues that the reasons cited by the ALJ for discounting her credibility regarding the severity of her mental impairments were invalid. First, she contends that the ALJ improperly discounted her credibility because she didn't receive mental health treatment until 2009. (AR 17). Under SSR 96-7p, lack of treatment can support an adverse credibility finding if the claimant doesn't have a good reason for the failure to seek

treatment. The ALJ "'must not draw any inferences' about a claimant's condition from this failure unless the ALJ has explored the claimant's explanations as to the lack of medical care." Craft v. Astrue, 539 F.3d at 679 (*quoting* SSR 96-7p); *see also* Shauger v. Astrue, 675 F.3d at 696. An ALJ can "question the individual at the administrative proceeding in order to determine whether there are good reasons the individual does not seek medical treatment," and a "good reason" includes the inability to afford treatment. SSR 96-7p; Myles v. Astrue, 582 F.3d 672, 677 (7th Cir. 2009). The ALJ made no effort to question Ms. Sanders about why she didn't begin treatment until 2009, a clear error under SSR 96-7p.

The Commissioner contends that Ms. Sanders has not shown how this error caused her harm because the ALJ also based his credibility assessment on evidence of improvement with medication, records that indicate her primary complaints were about her physical condition, and the lack of any hospitalization for her mental impairments. This court agrees. As discussed more fully below, the ALJ gave other sound reasons for finding Ms. Sanders not entirely credible such that the error of failing to further question Ms. Sanders about why she did not seek treatment was harmless. Keys v. Barnhart, 347 F.3d 990, 994 (7th Cir. 2003) (holding that the doctrine of harmless error applies to administrative decisions).

Ms. Sanders next contends that the ALJ erred in finding that Ms. Sanders was not credible because the records show that "her condition had improved over time, with regular counseling and medication, despite her

continued complaints of depressive symptoms." (AR 20). Ms. Sanders argues that the record shows that her condition had not improved. The ALJ cited treatment notes in the record in which Ms. Sanders reported that her condition was improving, including treatment notes from November 2009 in which Ms. Sanders reported that she had been "fine" and had been sleeping six hours per night. (AR 19). The ALJ also noted that Ms. Sanders also reported being "much less depressed" with "no auditory hallucinations and controlled anxiety." (AR 19). The ALJ noted that in December 2009, Ms. Sanders reported improvement in her depressive symptoms with "increased energy and motivation, fewer episodes of crying, minimal stress, manageable anxiety, and a greater range of activities of daily living." (AR 19). Based on a review of the record evidence cited by the ALJ and the record as a whole, it wasn't unreasonable or "patently wrong" for the ALJ to conclude that Ms. Sanders's condition was not as dire as she contended in light of her statements that prescribed treatments were effective.

Next, Ms. Sanders contends that the ALJ improperly discounted her credibility because she hadn't been hospitalized for her mental impairment. Under SSR 96-7p, an ALJ may consider the type of treatment the claimant has received when assessing the claimant's credibility. The ALJ didn't err when he considered that no physician had treated Ms. Sanders's depression with hospitalization. *See* <u>Connour v. Barnhart</u>, 42 F. App'x 823 (7th Cir. 2002) (approving ALJ's consideration that claimant had never been hospitalized for

alleged back condition, among other considerations, in assessing claimant's credibility).

Finally, Ms. Sanders argues that the ALJ erred in concluding that Ms. Sanders had "acknowledge[d] that Celexa has been fairly effective in controlling her psychological symptoms." (AR 20). Ms. Sanders contends this finding isn't a fair characterization of the evidence. The court disagrees; this characterization of the record evidence is reasonable. Ms. Sanders testified at her hearing that Celexa was "helping," (AR 69) and Dr. Kang's treatment notes indicate that after he put Ms. Sanders on Celexa she reported that her condition was "better" with "less crying or sad feeling" (AR 425, 430).


IV. CONCLUSION

The Commissioner's denial of benefits is REVERSED and this case is REMANDED with instructions to return the matter to the Social Security Administration for further proceedings consistent with this opinion.

IT IS SO ORDERED.

ENTERED:  September 6, 2012


_____/s/ Robert L. Miller, Jr._____ _____
Judge
United States District Court